# 26-2414

## United States Court of Appeals for the Second Circuit

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, NOT DEAD YET, UNITED SPINAL ASSOCIATION, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs and Appellants,*

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. McDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants and Appellees.*

On Appeal from the U.S. District Court, Eastern District of New York,
Case No. 1:26-cv-03492-OEM-JAM,
Hon. Orelia E. Merchant

**APPELLANTS' OPENING BRIEF**

**HALLORAN FARKAS + KITTILA LLP**
Theodore A. Kittila
*tk@hfk.law*
Jeffrey M. Greilsheimer
*jg@hfk.law*
600 Third Avenue, 2nd Floor
New York, New York 10016
Telephone (646) 825-2390

**ROSEN BIEN GALVAN & GRUNFELD LLP**
Michael W. Bien
*mbien@rbgg.com*
Ernest Galvan
*egalvan@rbgg.com*
101 Mission Street, Sixth Floor
San Francisco, California 94105
Telephone: (415) 433-6830

*Attorneys for Plaintiffs and Appellants*

## TABLE OF CONTENTS

INTRODUCTION .......... 1
JURISDICTIONAL STATEMENT .......... 2
STATEMENT OF THE ISSUE .......... 3
STATEMENT OF THE CASE .......... 3
I. Local Rule 28.1(b) Statement .......... 3
II. Factual Background .......... 4
A. The Medical Aid in Dying Act Provides Lethal Medication with Few Safeguards to Individuals with Disabilities .......... 4
B. Plaintiffs Are Individuals Whose Medical Care is Compromised by the Act and Organizations Whose Core Activities and Members Are Injured by the Act .......... 7
III. Procedural History .......... 9
SUMMARY OF THE ARGUMENT .......... 11
STANDARD OF REVIEW .......... 15
ARGUMENT .......... 15
I. The Individual Plaintiffs Alleged an Injury in Fact .......... 15
A. Plaintiffs Hernandez and Cameron Face Imminent Injury Because of the Act .......... 15
1. Plaintiffs Are at Substantial Risk of Becoming Eligible for Assisted Suicide .......... 16
2. Eligibility Under the Act Injures People with Disabilities by Imposing a Discriminatory Standard of Care for Suicidality .......... 22
B. Plaintiffs' Current Medical Care Is Also Damaged by the Act .......... 25
C. The District Court Wrongly Found that Plaintiffs Lacked Standing Solely Because Their Disabilities Are Not Currently Terminal Under the State's Interpretation of the Act .......... 28
II. The Organizational Plaintiffs Also Have Standing .......... 34
A. The Organizational Plaintiffs Have Associational Standing to Sue on Behalf of Their Members .......... 34

B. The Organizational Plaintiffs Suffer Direct Injuries from the Act ....................38

III. The Court Should Vacate the Denial of Plaintiffs' Request for Preliminary Relief....................44

CONCLUSION ....................45

# TABLE OF AUTHORITIES

## CASES

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) ....................................................................35

*Bohnak v. Marsh & McLennan Cos., Inc.*,
79 F.4th 276 (2d Cir. 2023) ....................................................................15

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026)....................................................................................21

*Brokamp v. James*,
66 F.4th 374 (2d Cir. 2023) ....................................................................33

*Brooklyn Ctr. for Indep. of the Disabled v. Hochul*,
No. 26-cv-03492, 2026 WL 2198870 (E.D.N.Y. July 30, 2026)....................3

*Bryman v. Murphy*,
161 F.4th 174 (3d Cir. 2025) ..................................................................17

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)....................................................................................24

*Carney v. Adams*,
592 U.S. 53 (2020)....................................................................................21

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016) .............................................................. 15, 17

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017) ....................................................................39

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..................................................................................33

*Clementine Co., LLC v. Adams*,
74 F.4th 77 (2d Cir. 2023) ......................................................................27

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
167 F.4th 605 (2d Cir. 2026) ............................................................ 14, 39, 41

*Conn. Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021) ........................................................ 34, 39, 40, 42

*Costin v. Glens Falls Hosp.*,
103 F.4th 946 (2d Cir. 2024) ...................................................... 17, 19, 20, 32

*Dardana Ltd. v. Yuganskneftegaz*,
317 F.3d 202 (2d Cir. 2003) ....................................................................45

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025)....................27

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025)....................35

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024).................... passim

*FEC v. Cruz*,
596 U.S. 289 (2022).................... 13, 29

*Govatos v. Murphy*,
No. 23-cv-12601, 2024 WL 4224629 (D.N.J. Sept. 18, 2024) ........ 17, 21, 22

*Haaland v. Brackeen*,
599 U.S. 255 (2023).................... 13, 24

*Hargrave v. Vermont*,
340 F.3d 27 (2d Cir. 2003)....................20

*Harty v. West Point Realty, Inc.*,
28 F.4th 435 (2d Cir. 2022)....................25

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................35

*Hunter v. McMahon*,
75 F.4th 62 (2d Cir. 2023)....................45

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).................... 15, 28

*Massachusetts v. Mellon*,
262 U.S. 447 (1923)....................21

*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*,
861 F.3d 40 (2d Cir. 2017)....................25

*New York Public Interest Research Group v. Whitman*,
321 F.3d 316 (2d Cir. 2003)....................37

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020).................... 39, 40, 42

*Nnebe v. Daus*,
644 F.3d 147 (2d Cir. 2011)....................39

*Parker v. Shapiro*,
No. 24-cv-2279, 2025 WL 973477 (E.D. Pa. Mar. 31, 2025)....................21

*Peace Ranch, LLC v. Bonta*,
93 F.4th 482 (9th Cir. 2024)....................32

*Ragin v. Harry Macklowe Real Estate Co.*,
6 F.3d 898 (2d Cir. 1993) ....................39

*Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*,
88 F.4th 103 (2d Cir. 2023) .................... 12, 16, 33

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ....................15

*Soule v. Conn. Ass'n of Schs., Inc.*,
90 F.4th 34 (2d Cir. 2023) .................... 24, 29

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)....................35

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014).................... passim

*T.M. v. Univ. of Md. Med. Sys. Corp.*,
608 U.S. 668 (2026)....................45

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020).................... 15, 25

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).................... 25, 33

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021)....................28

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988)....................33

*Vt. Right to Life Comm., Inc. v. Sorrell*,
221 F.3d 376 (2d Cir. 2000) .................... 13, 30

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
549 F.3d 100 (2d Cir. 2008) ....................15

*Warth v. Seldin*,
422 U.S. 490 (1975).................... 35, 36

*Wynder v. McMahon*,
360 F.3d 73 (2d Cir. 2004) ....................3

**STATUTES**

N.Y. Mental Hyg. Law § 9.41 ....................6, 22

N.Y. Penal Law § 120.30....................6

N.Y. Penal Law § 260.34....................6

N.Y. Pub. Health Law § 2899-d ........................................................ passim

N.Y. Pub. Health Law § 2899-e........................................................................4

N.Y. Pub. Health Law § 2899-f................................................... 4, 5, 30, 38

N.Y. Pub. Health Law § 2899-i ......................................................... 4, 5, 23

N.Y. Pub. Health Law § 2899-q ....................................................................31

N.Y. Pub. Health Law § 2997-c........................................................................5

**RULES**

Fed. R. App. P. 4(a) .........................................................................................2

**OTHER AUTHORITIES**

Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/provide ...............................31

## INTRODUCTION

When a person in New York tells a physician that they want to die, State law instructs the doctor to give two different responses depending on who expressed that suicidal intent. If the person has a type of disability that New York's Medical Aid in Dying Act calls a "terminal illness or condition," the doctor generally will start the State-approved process for the patient to end their life. For everyone else, the standard of care instead requires the doctor to mobilize the State's lifesaving services to keep the patient from dying by suicide.

That difference in treatment is discrimination on the basis of disability. As Plaintiff Anita Cameron put it before the district court, the Act "tells people like me that they should qualify for suicide help, not suicide prevention." JA 44. The individual Plaintiffs are now subject to this discriminatory system that places them in an inferior tier of medical care. And they rightly fear that the Act will imminently deprive them of the full force of New York's suicide prevention programs. Both individual Plaintiffs have serious, longstanding conditions that have left them hospitalized and despondent in the past. They both have experienced egregious medical bias of the kind that could lead a doctor to mistakenly deem "terminal" Ms. Cameron's multiple sclerosis or Mr. Hernandez's paralysis. The organizational Plaintiffs too fear the application of the Act because of the risk to their members with life-threatening disabilities and the threat to the

services at the heart of their work.

The district court nevertheless dismissed this lawsuit less than two months after it was filed. The court found that no one had alleged an injury in fact because it concluded as a matter of law that neither the individual Plaintiffs nor the organizations' members were currently eligible for assisted suicide. It did not consider either the immediate impacts on the quality of Plaintiffs' medical care or their risk of future harm when they become eligible for lethal medication. And its conclusion rested on an interpretation of ambiguous language in the Act that the State proposed in this litigation.

The district court's ruling misread Plaintiffs' claims, erred in its application of standing law, and improperly made merits determinations at the pleading stage. This Court should reverse the dismissal of Plaintiffs' complaint.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) over Plaintiffs' claims arising under 42 U.S.C. § 1983 and the United States Constitution. The district court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims arising under the New York State Constitution. The district court issued an order dismissing this action on July 30, 2026, and entered judgment on July 31, 2026. JA 25. Plaintiffs filed a timely notice of appeal on August 27, 2026. JA 26–27; *see* Fed. R. App. P. 4(a)(1)(A).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. *See Wynder v. McMahon*, 360 F.3d 73, 76 (2d Cir. 2004).

## STATEMENT OF THE ISSUE

Whether Plaintiffs—(1) individuals whom New York's Medical Aid in Dying Act, N.Y. Pub. Health Law §§ 2899-d *et seq.*, subjects to discriminatory medical care for suicidality based on their disabilities, and (2) organizations whose members are likely to experience similar discrimination or die by suicide as a result of the Act—have adequately alleged an injury in fact for purposes of Article III standing.

## STATEMENT OF THE CASE

### I. Local Rule 28.1(b) Statement

Plaintiffs are individuals with life-threatening disabilities and organizations that advocate for and assist people with disabilities. Defendants are New York Governor Kathy Hochul and other State entities and officials sued in their official capacities (collectively, the "State"). Appellants brought this action to challenge the enforcement of the Act, which went into effect on August 5, 2026.

Plaintiffs filed their complaint and a motion for a temporary restraining order on June 11, 2026. On July 30, 2026, Judge Orelia E. Merchant of the United States District Court for the Eastern District of New York dismissed the entire action for lack of subject matter jurisdiction and denied as moot Plaintiffs' request for preliminary relief. *Brooklyn Ctr. for Indep. of the Disabled v. Hochul*, No. 26-

cv-03492, 2026 WL 2198870, at *10 (E.D.N.Y. July 30, 2026).

## II. Factual Background

### A. The Medical Aid in Dying Act Provides Lethal Medication with Few Safeguards to Individuals with Disabilities

New York's Medical Aid in Dying Act (the "Act") allows physicians to "dispen[se] lethal drugs five days after a patient makes an oral request . . . and a written request to their attending provider." JA 99 (citing N.Y. Pub. Health Law §§ 2899-e(1), 2899-f(2)–(3)).[1] The lethal prescription can be filled sooner—"within hours or even minutes of the first request"—if the physician believes that the person requesting the medication has less than five days to live. JA 122 (citing N.Y. Pub. Health Law § 2899-f(3)). The Act went into effect on August 5, 2026. JA 99.

The Act contains relatively few procedural protections before an eligible person who wants to die can receive lethal medication. "The Act requires a mental health professional to evaluate whether a patient has 'decision-making capacity to make an informed decision,'" *id.* (quoting N.Y. Pub. Health Law § 2899-i(1)), but this evaluation is limited to whether the person has "the ability to understand and appreciate the nature and consequences of health care decisions," N.Y. Pub. Health Law § 2899-d(3). The mental health provider is not required to evaluate "a

[1] Pursuant to Federal Rule of Appellate Procedure 28(f), the Act is reproduced in an addendum to this brief.

patient's psychiatric or psychological condition," such as any history of depression or suicidality. JA 100. The evaluation is limited to decision-making capacity only. *See* N.Y. Pub. Health Law § 2899-i(1).

The Act also does not require the prescribing physician to "even ever see the suicidal patient in person." JA 101. The physician must "offer to provide the patient with . . . information and counseling regarding palliative care and end-of-life options." N.Y. Pub. Health Law § 2997-c(2); *see also id.* § 2899-f(1)(d). But there is no requirement "that people meaningfully consider, exhaust, and/or knowingly reject" alternatives to assisted suicide, nor that the State ensure they have access to such alternatives, before receiving lethal drugs. JA 101–02. The Act also "fails to require the provision or exhaustion of the State's suicide prevention programs, which are expressly designed to address the underlying concerns that drive people to suicidal thoughts." JA 101. For people who meet the Act's eligibility criteria, "[t]he Act assumes that a request for assisted suicide is not an indication of a mental disorder." JA 100.

A request for assisted suicide gets a different response when it comes from someone who does not meet the Act's eligibility standard. Most people in New York who tell a physician that they want to die are quickly connected to an array of suicide prevention services to help them live. *See* JA 103–04, 113. For instance, they "may be immediately transferred to a psychiatric emergency program,

hospital, or connected with other emergency services," and "the standard of care requires" doctors to provide those services. JA 113 (citing N.Y. Mental Hyg. Law § 9.41). Endangering such people or offering to help them kill themselves is a felony under New York law. JA 95, 103 (citing N.Y. Penal Law §§ 120.30, 260.34). Only people who are deemed eligible for lethal medication under the Act are treated differently.

The Act's eligibility standard is disability-based. To be eligible for lethal medication under the Act, a person must have "an incurable and irreversible illness or condition" that the prescribing physician believes, in their "reasonable medical judgment," will "produce death within six months whether or not treatment is provided." N.Y. Pub. Health Law § 2899-d(17). All people who have an illness or condition that qualifies them for lethal medication under the Act are individuals with disabilities for purposes of the Americans with Disabilities Act and related antidiscrimination statutes. JA 104.

This disparate treatment based on disability is not justified by the Act's asserted rationale of alleviating end-of-life suffering. The Act's eligibility criteria bear little relationship to a seriously disabled person's level of suffering or actual proximity to death. *See* JA 120. "The overwhelming research and clinical information demonstrate that predictions of death six months out from the event are inherently unreliable, that physicians are not particularly good prognosticators,

and that any such prediction is deeply tainted by impermissible stereotypes and discriminatory biases." JA 120–21. In addition, as alleged in the complaint, people with treatable conditions can become "eligible for assisted suicide if treatments or supports are denied by their insurance company, refused, or otherwise [are] not available." JA 100. A patient can "make themselves eligible for assisted suicide by declining available medical treatment" or by refusing food and water. JA 100–01. Some providers therefore "advocate for the use of VSED [the voluntary stopping of eating and drinking] as a 'bridge' to qualify for lethal drugs." JA 101.

### B. Plaintiffs Are Individuals Whose Medical Care is Compromised by the Act and Organizations Whose Core Activities and Members Are Injured by the Act

Plaintiffs José Hernandez and Anita Cameron are two New York State residents with life-threatening disabilities. Mr. Hernandez "is paralyzed from the neck down with limited movement in his arms and no movement below his shoulders." JA 75. Ms. Cameron has "multiple sclerosis and congenital cerebellar ataxia"; she "is a wheelchair user and is almost completely blind." JA 76. She also has depression and fears that "she will go to the doctor or hospital during a low point and will be steered into physician-assisted suicide." JA 77.

Both Hernandez and Cameron are or are at imminent risk of becoming eligible for lethal medication under the Act because of their precarious health and

disabilities. *See* JA 76–77. In addition, the Act "changes the manner in which physicians and other healthcare professionals provide treatment for people with life-threatening disabilities." JA 111. Because of the Act, Hernandez and Cameron already receive an inferior standard of medical care, in which a physician's duty can be assisting the patient in ending his or her life instead of working with the patient to alleviate suicidal thoughts. *See* JA 111–12.

The other Plaintiffs are disability rights organizations whose work and members are directly affected by the Act. Plaintiffs Brooklyn Center for Independence of the Disabled ("BCID"), Self-Initiated Living Options, Inc. ("SILO"), and Independent Living Center of the Hudson Valley ("ILCHV") all provide services to people with disabilities to help them "live as independently as possible," which includes "discourag[ing] people with disabilities, especially those with life-threatening disabilities, from committing suicide." *See* JA 74, 78–79. BCID's constituents "call BCID frequently in despair," and several of ILCHV's consumers have already expressed suicidality and are at risk of dying when they become eligible for the Act. JA 74, 80.

Plaintiff United Spinal "operates a peer mentor support program" to help its members survive the fear and depression that often accompany severe spinal cord injuries. *See* JA 83; *see also* JA 58–59 (discussing peer support services to help newly injured members survive "depression, isolation," and "suicidal thoughts . . .

after injury"). "BCID's core business activities" similarly include "peer counseling and mentoring." JA 37. ILCHV conducts "peer counseling services" as well. JA 49. Their work will be made materially more difficult by the Act's facilitation of suicide for these individuals. *See* JA 83–84; *see also* JA 37.

In addition, members of BCID, SILO, ILCHV, United Spinal, Regional Center for Independent Living ("RCIL"), and National Council on Independent Living ("NCIL") are all at risk of dying through the Act's assisted suicide procedures. JA 37–38, 78–81, 84. BCID's members in New York have considered "accessing lethal medications and/or committing suicide by means of the Act," and the Act "places BCID's members at risk of dying by offering the option of assisted suicide during a period of treatable depression and difficulty." JA 37–38; *see also* JA 47 (similar allegations regarding SILO's members); JA 49–50 (similar allegations regarding ILCHV's members). Plaintiff Hernandez is a member of United Spinal, and Plaintiff Cameron is a member of United Spinal, RCIL, and NCIL. JA 53, 60, 62–63; *see also* JA 21.

## III. Procedural History

Plaintiffs filed their complaint and moved for a temporary restraining order on June 11, 2026. *See* JA 156. The district court denied the temporary restraining order without a hearing on June 15, 2026, construed Plaintiffs' motion *sua sponte* as a request for preliminary injunctive relief, and ordered the State to respond by

June 23, 2026. JA 157–58. On June 25, 2026, the court held a hearing on the preliminary injunction and an intervention motion filed by proposed Defendant-Intervenors. JA 160.

On July 6, while the preliminary injunction was under consideration by the district court, the State filed a three-page request for a pre-motion conference to discuss its "inten[tion] to move to dismiss all claims in the Complaint." *See* JA 30. The request included one paragraph summarizing the arguments about Article III standing that the State planned to make in a motion to dismiss. *Id.* After Plaintiffs submitted a letter brief on July 13 responding to the request for a pre-motion conference, the district court issued an order on July 16 construing the State's request for a pre-motion conference as a motion to dismiss for lack of subject matter jurisdiction and directing Plaintiffs to respond by a further letter brief. JA 161. Plaintiffs filed their additional letter brief on July 23. *Id.*

On July 30, 2026, the district court issued a memorandum opinion and order dismissing the case for lack of subject matter jurisdiction. JA 5. The court concluded that the individual Plaintiffs did not allege an injury in fact sufficient for Article III standing based on the State's interpretation of the Act's definition of terminal illness, under which the individual Plaintiffs were not at that time eligible for lethal medication. JA 14. The court found that this same problem with "Plaintiffs' legal theory of injury to individuals with disabilities also dooms

Organizational Plaintiffs' claims to associational standing" because the complaint's allegations did not show that any organization members were currently eligible for assisted suicide under the Act. *See* JA 22.

The district court also found that the organizations lacked direct standing because "[f]rustration of an organization's mission does not confer Article III standing" and because the organizations' "alleged expenditure of resources" was insufficient too. JA 17. The court did not address any other element of Article III standing. *See generally* JA 12–22. The court denied as moot the request for a preliminary injunction and entered judgment for the State the next day. JA 23, 25.

Plaintiffs timely appealed. JA 26–27.

## SUMMARY OF THE ARGUMENT

The district court dismissed the claims of the individual Plaintiffs because it found that they had not alleged an injury in fact sufficient for Article III standing. The court's ruling was incorrect.

*First*, the court reasoned that Plaintiffs lacked standing based entirely on its conclusion that they were not currently eligible for assisted suicide under the Act. That conclusion was inconsistent with standing law and nonresponsive to Plaintiffs' allegations.

It is well established that a "future injury is sufficient" to satisfy Article III's standing requirement "where the threatened injury is 'certainly impending,' or

there is a 'substantial risk' that the harm will occur." *Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 111 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Plaintiffs alleged that they are likely to become eligible for assisted suicide in the future if their serious medical conditions continue to deteriorate, if they become suicidal and start refusing care, or if they are misdiagnosed as terminal because of widespread bias in the medical profession about people with disabilities. Those risks are substantial; the individual Plaintiffs both have medically precarious conditions, have struggled with depression, and have experienced medical discrimination in the past.

*Second*, in reaching its conclusion that the individual Plaintiffs are not currently eligible, the court relied on the State's interpretation of the relevant provision of the Act. The Act makes a person eligible for assisted suicide if a doctor determines they have "an incurable and irreversible illness or condition" that will "produce death within six months whether or not treatment is provided." N.Y. Pub. Health Law § 2899-d(17). The court adopted the State's view that this provision excludes people who refuse treatment or for whom treatment is unavailable in practice, and it disregarded many of Plaintiffs' allegations on that basis.

That determination ran afoul of the rule that courts must "accept as valid the

merits of [the plaintiffs'] legal claims" when evaluating standing. *FEC v. Cruz*, 596 U.S. 289, 298 (2022). This Court has rejected the argument that a plaintiff lacked standing to challenge a state statute based on the statutory interpretation the state advanced in litigation. *See Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000). The district court should have done so too.

Plaintiffs also adequately alleged that they will be injured when they become eligible for assisted suicide under the Act. Under the Act, the State provides disparate treatment for suicidality based on disability. People who do not meet the Act's eligibility criteria receive the full force of New York's suicide prevention system if they tell a physician that they desire to die. But people who are eligible for the Act—and it is undisputed that all such people are individuals with disabilities under federal antidiscrimination statutes—instead receive State-endorsed medical assistance to carry out their suicidal intentions. That discrimination "counts as an Article III injury." *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023).

In addition, the district court erred by disregarding the Act's immediate impact on the quality of medical care available to the individual Plaintiffs. Plaintiffs alleged that the Act currently consigns them to "an inferior tier of medical care." JA 76–77. The individual Plaintiffs have complex medical conditions, which require them frequently to rely on providers' advice about the

benefits and burdens of new and continued treatment. JA 75–77. The Act impairs their treatment by undermining their therapeutic relationship with their providers. *See* JA 111–12. This harm was imminent when the Complaint was filed, two months before the Act's effective date, and is now actual. The district court, focused only on its construction of "terminal illness" under the Act, gave it no consideration.

The district court further concluded that the organizational Plaintiffs lacked both direct and associational standing. The court denied associational standing for the same reasons why it rejected the individual Plaintiffs' standing. The same errors that undergird its assessment of the individual Plaintiffs' claims infect its associational analysis too.

As to the organizations' direct standing, the district court incorrectly determined that the organizational Plaintiffs alleged harm only to their public advocacy efforts. But the organizations alleged a range of injuries to their core member services, including impairment of their counseling and referral services and the threat that their constituents will die by suicide. *See Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (confirming that impairment of an organization's "counseling and referral services" constitutes an injury in fact). This Court should reverse.

## STANDARD OF REVIEW

The Court "review[s] *de novo* whether a plaintiff has constitutional standing to sue." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). When "standing is challenged on the basis of the pleadings," the Court "accept[s] as true all material allegations of the complaint" and construes those allegations "in favor of the complaining party." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 540 (2d Cir. 2024) (quoting *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 283 (2d Cir. 2023)). "[O]n a facial challenge," the Court "presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 58 (2d Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## ARGUMENT

### I. The Individual Plaintiffs Alleged an Injury in Fact

#### A. Plaintiffs Hernandez and Cameron Face Imminent Injury Because of the Act

"To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). "[A]n allegation of future injury is sufficient" to satisfy Article III's standing requirement

"where the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Saba Cap.*, 88 F.4th at 111 (internal quotation marks omitted) (quoting *Susan B. Anthony List*, 573 U.S. at 158). But the district court dismissed the claims of Plaintiffs Hernandez and Cameron solely because it found that they were not currently eligible for lethal medication under the Act. *See* JA 13–15. That was error.

#### 1. Plaintiffs Are at Substantial Risk of Becoming Eligible for Assisted Suicide

Plaintiffs Hernandez and Cameron each adequately alleged that they face a "substantial risk" of being subjected to the Act's discriminatory standard of care for suicidality if their health deteriorates, if they become depressed and start refusing care, or if they are wrongly identified as terminal by a physician based on discriminatory biases about people with disabilities. *Saba Cap.*, 88 F.4th at 111; *see also* JA 76–77 (alleging that Hernandez and Cameron are at "imminent risk" of being subjected to the Act). People are eligible for assisted suicide under the Act if they have a "[t]erminal illness or condition," defined to mean "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided." N.Y. Pub. Health Law § 2899-d(17).

Plaintiffs Hernandez and Cameron face a "substantial probability" of coming within the Act's definition of terminal illness in the future as their health declines.

*See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 953 (2d Cir. 2024). Hernandez and Cameron each live with severe disabilities that have resulted in frequent hospitalizations and periods of deterioration. Hernandez's spinal cord injuries "limit [his] capacity for breathing" and make him "feel like [he is] drowning." JA 39.[2] He would die without 24-hour care. JA 40. Cameron has degenerative disabilities, including multiple sclerosis and congenital cerebellar ataxia. JA 42. She has had tumors on her lungs since 2019. JA 43. Given the "seriousness of their illnesses" and the likelihood that "their prognoses [will] worsen" in the future, Hernandez and Cameron have standing now to avert the harm they will otherwise face "when their time—sadly but ineluctably—comes." *See Govatos v. Murphy*, No. 23-cv-12601, 2024 WL 4224629, at *6 (D.N.J. Sept. 18, 2024) (finding that plaintiffs who "have not received a six-month prognosis and do not (yet) qualify as 'terminally ill'" have standing to challenge residency requirement of New Jersey's Medical Aid in Dying for the Terminally Ill Act), *aff'd sub nom. Bryman v. Murphy*, 161 F.4th 174 (3d Cir. 2025).

Hernandez and Cameron also face a substantial probability of qualifying for

[2] To evaluate Plaintiffs' standing, the district court relied on the declarations submitted with Plaintiffs' motion for temporary restraining order in addition to the allegations in the complaint. *See* JA 11. Plaintiffs therefore rely on those declarations as well. The State did not "proffer[] evidence beyond the Pleading" in any of its filings to controvert Plaintiffs' allegations or declarations. *See Carter*, 822 F.3d at 57.

lethal medication under the Act if they become depressed or suicidal and start refusing the care and treatment on which their lives depend. As Plaintiffs alleged, a person with a life-threatening disability can "make themselves eligible for assisted suicide by declining available medical treatment that would likely extend their lives." JA 100. In those cases, the person will die within six months notwithstanding the fact that "treatment is provided." N.Y. Pub. Health Law § 2899-d(17).

When a person refuses food and water as part of rejecting medical care, that refusal itself can also qualify the person for lethal medication. JA 100–01. States with similar assisted suicide laws have allowed people with life-threatening disabilities to "hasten[] death by foregoing food and water . . . as a 'bridge' to qualify for lethal drugs." JA 101; *see also* JA 109–10. "There are providers who will certify a patient as 'terminal' . . . based on a patient's having begun [voluntary stopping of eating and drinking], regardless of whether there is an underlying medical condition." JA 101. Refusals of nutrition, hydration, and lifesaving care are likely to be treated as terminal under the Act as well. *See* JA 100–01; *see also* JA 108–10. And people can also become eligible under the Act when no life-preserving treatment for their conditions is available in practice—such as when an insurance company denies coverage of the treatment. JA 100. "[T]he Act does nothing to ensure that insurers do not deny or delay approval of life-saving or life-

extending therapies . . . while at the same time covering the costs of assisted suicide." JA 117–18.

Cameron has depression and has "considered suicide in the past." JA 43. And people like Hernandez who have serious spinal cord injuries often experience "depression, isolation, [and] loss of self-confidence," and have "suicidal thoughts" as a result of those challenges. JA 83. Indeed, these experiences are common among all people with disabilities, who "are significantly more likely than those without disabilities to report suicidal ideation, suicide planning, and suicide attempts." JA 95. That is especially true for people like Hernandez and Cameron whose disabilities include "impairments involving self-care and/or independent living tasks." *Id.*; *see also* JA 75–76 (describing Hernandez and Cameron's disabilities and need for assistance). As a result, Hernandez and Cameron each face a "substantial probability" of becoming suicidal in the future, refusing care or nourishment, and thereby qualifying for assisted suicide under the Act. *See Costin*, 103 F.4th at 953. They also may become eligible for lethal medication if necessary care is unavailable in practice because their insurers deny coverage. *See* JA 40–41, 43–44, 100, 117–18.

Finally, Hernandez and Cameron are at substantial risk of being misdiagnosed as terminal and becoming eligible for assisted suicide on that basis. Both Hernandez and Cameron have experienced medical discrimination because of

their disabilities and have received inaccurate diagnoses from doctors. *See* JA 40, 43–44. And people with spinal cord injuries like Hernandez are especially "likely to be perceived as terminally ill." JA 106. Moreover, doctors' prognoses on a six-month timescale are frequently inaccurate, even when they are not swayed by discriminatory bias about people with disabilities. JA 120–21; *see also* JA 112. As just one example, Hernandez's mother was incorrectly diagnosed as having six months to live due to advanced ovarian cancer; she ultimately "lived another 13 years after this diagnosis." JA 40. If Cameron and Hernandez are wrongly diagnosed as terminal due to bias or mistake, they will become immediately eligible for death because of the Act.

None of these risks are "speculative." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The prospect that Plaintiffs will become subject to the Act in the future is no more distant than the risk of future harm in *Costin*, where a woman who had experienced disability discrimination during childbirth at a local hospital had standing to seek prospective relief based on the likelihood that at some point she would probably "have to return to the Hospital as a patient in some capacity." *Costin*, 103 F.4th at 953. It is also no more hypothetical than *Hargrave v. Vermont*, 340 F.3d 27 (2d Cir. 2003), where the plaintiff had standing even though the involuntary medication procedures authorized by the statute she was challenging were already blocked by a separate injunction when she filed suit. *See*

*id.* at 31–34.

For injury in fact, "[w]hat matters is that the harm [the plaintiffs] suffer is distinct from that suffered by the 'people generally.'" *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 78 (2026) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)). Hernandez and Cameron have life-threatening disabilities that have resulted in periods of deterioration and hospitalization. JA 39–40, 42–44. They have each experienced medical discrimination in the past. *See, e.g.*, JA 75–77. The risk of harm they assert is not an "abstract generalized grievance suffered by all citizens." *Carney v. Adams*, 592 U.S. 53, 59 (2020). Their fear is that they will personally be subjected to a discriminatory medical system by the Act and put in danger of being steered toward suicide "when their time—sadly but ineluctably—comes." *Govatos*, 2024 WL 4224629, at *6.

Courts have found that plaintiffs in almost precisely the same circumstances as Hernandez and Cameron have standing in suits seeking expanded access to assisted suicide procedures. *See id.* (finding standing for plaintiffs without present terminal diagnosis because "they are currently suffering the 'stress' and 'anxiety' of not knowing whether they could access medical aid in dying as non-New Jersey residents" when their conditions become terminal); *see also Parker v. Shapiro*, No. 24-cv-2279, 2025 WL 973477, at *4 (E.D. Pa. Mar. 31, 2025) (finding that plaintiff whose serious illnesses had not been confirmed as terminal nonetheless

had standing to challenge State prohibition on assisted suicide). Like those plaintiffs, Hernandez and Cameron have alleged "a risk of future harm that is sufficiently imminent and substantial to satisfy Article III" because of the likelihood that "their illnesses [will] become terminal" in the future. *Govatos*, 2024 WL 4224629, at *6. The district court erred in concluding that Hernandez and Cameron lack standing based solely on its finding that their disabilities are not currently terminal. *See* JA 14.

### 2. Eligibility Under the Act Injures People with Disabilities by Imposing a Discriminatory Standard of Care for Suicidality

Hernandez and Cameron have also plausibly alleged that becoming subject to the Act would injure them by placing them into a disfavored system of suicide prevention. As detailed in the complaint, the Act and the officials who enforce it have created a two-tiered suicide prevention system in New York. *See, e.g.*, JA 113–15.

Suicidal people who do not have life-threatening disabilities are entitled to lifesaving services under New York law. If they "conduct themselves in a manner likely to result in serious harm," they "may be immediately transferred to a psychiatric emergency program, hospital, or connected with other emergency services." JA 113 (citing N.Y. Mental Hyg. Law § 9.41). If they "express[] suicidal intentions to a physician," the standard of care requires their doctor to mobilize "an entire system of prevention measures . . . , including emergency

behavioral health services and/or inpatient programs." *Id.*; *see also* JA 104 (alleging that the standard of care under New York law for people without life-threatening disabilities "requir[es] providers to respond to suicidal wishes in a way that protects the person's life"). When a person without these disabilities "expresses a desire to stop living, this is considered a medical emergency." JA 111–12. And if the physician helps the non-disabled person die by suicide, that is a felony under New York law. JA 95.

But for suicidal people who come within the statute's definition of "[t]erminal illness," the response of New York's medical system is radically different now that the Act is in effect. N.Y. Pub. Health Law § 2899-d(17). For those people, the Act "permit[s] the withholding of suicide prevention services and interventions." JA 113. Instead, the Act "allow[s] dispensing lethal drugs five days after" the individual expresses to a physician their desire to die—or even the same day for some patients. JA 99, 122. The health care professionals involved in the process "are not required to even consider a patient's psychiatric or psychological condition or how that may affect their suicidality." JA 100 (citing N.Y. Pub. Health Law § 2899-i).

As Plaintiffs alleged, "[a]ll people in New York who will qualify for the Act by having a 'terminal illness or condition' will have conditions that qualify as disabilities under the ADA and Section 504." JA 104. The district court did not

address that allegation, and the State did not dispute it below. *See generally* JA 12–22; *see also* Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. ("Opp'n to Prelim. Inj."), Dist. Ct. Dkt. 23 at 14–17, 16 n.7. For those people with disabilities, "[t]he Act assumes that a request for assisted suicide is not an indication of a mental disorder, when other New York laws make precisely the opposite assumption for virtually everyone else" who expresses suicidal intent. JA 100.

In sum, when people with life-threatening disabilities express suicidality to physicians, they alone receive State-approved assistance to end their lives in lieu of the State's normal lifesaving measures. And New York provides this assistance knowing that these people are likely to face significant pressure to die by suicide or may see death as their only viable option due to deficiencies in the State's palliative care system. *See* JA 116–19. By authorizing physicians to suggest and facilitate suicide only for people with life-threatening disabilities, the Act imposes on these people with disabilities a disfavored standard of care for suicidality.

That "distinction[] or difference[] in treatment" causes injury whether or not the individual ultimately dies from physician-assisted suicide. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006). Discrimination itself "counts as an Article III injury." *Haaland*, 599 U.S. at 292; *see also Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 46 (2d Cir. 2023) (en banc) ("The Supreme Court has

identified 'discriminatory treatment' as an example of a 'concrete, *de facto*, injur[y].'" (alteration in original) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425–26 (2021))). There is no question that "'unequal treatment on the basis of a protected characteristic' can be an injury in fact for standing purposes." *Harty v. West Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022) (quoting *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 45 (2d Cir. 2017)). Plaintiffs Hernandez and Cameron face imminent harm under the Act because they will be subject to a discriminatory standard of care for suicidality as soon as they become eligible for lethal medication. The district court erred by ignoring their allegations of imminent injury. *See* JA 13–15.

### B. Plaintiffs' Current Medical Care Is Also Damaged by the Act

In addition, the Act immediately injures Plaintiffs Hernandez and Cameron by undermining their therapeutic relationship with their providers. Because of the Act, Hernandez and Cameron can no longer trust that their "doctors are always going to be on the side of [their] life." JA 112. The damage that the Act causes to their provider relationships is in no way dependent on whether they are currently eligible for lethal medication.

This injury is "concrete, particularized, and actual." *Thole*, 590 U.S. at 540. Hernandez and Cameron have life-threatening disabilities that frequently put them in situations where they must rely on medical professionals' advice to make life

and death decisions about the initiation or continuation of care. *See* JA 75–77. The inferiority of the post-Act system of medical care for people with life-threatening disabilities is described in the Complaint by the statements of medical experts about providers' role in working with individuals with such disabilities. *See* JA 111–12.

This damage to Plaintiffs' provider relationships occurs before their disabilities develop into a "[t]erminal illness or condition." N.Y. Pub. Health Law § 2899-d(17). As alleged in the complaint, the availability of assisted suicide as a treatment option "is fundamentally incompatible with the physician's role as healer." JA 122. It "changes the manner in which physicians and other healthcare professionals provide treatment for people with life-threatening disabilities" by focusing providers' "time and resources" toward suicide assistance and away from life-preserving care for people who do not want lethal medication. JA 111. The Act also changes the standard of care for people with life-threatening disabilities by creating more lenient liability and discipline rules for lethal medication as opposed to other forms of treatment. *See* JA 103–04.

For Dr. Alan Carver, a neurology and palliative care specialist, his experience caring for patients who have asked him for lethal prescriptions has "call[ed] into question the quality of care individuals with serious disabilities are receiving and raises a concern that [Dr. Carver's] patients may die by assisted

suicide merely because they have a treatment need that cannot be easily met." JA 112. A physician's personal favoring of assisted suicide as a treatment option or discomfort treating people with disabilities can also have profound implications for a seriously disabled patient's course of care. *See* JA 118.

For all of those reasons, the availability of assisted suicide under the Act immediately undermines Hernandez's, Cameron's, and other seriously disabled patients' relationships with their physicians. Hernandez and Cameron both have longstanding and well-grounded mistrust of the medical system's interest in preserving their lives and health. *See, e.g.*, JA 40 (discussing incident where medical provider suggested unnecessary amputation of Plaintiff Hernandez's toe "since [he] was not using it"); JA 43 (discussing medical providers' failure to inform Cameron of her lung tumors and suggestion that she was drug-seeking during periods of pain). The Act will further damage their trust in the medical system, and it will force them to spend time and money to determine whether their providers' recommendations are colored by personal views that they would be better off eased into an early death. That injury satisfies Article III, independent of their risk of future harm. *See Clementine Co., LLC v. Adams*, 74 F.4th 77, 83 (2d Cir. 2023) (additional cost of investigating patrons' vaccination status was injury in fact for Article III standing); *cf. Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (loss of "[e]ven 'one dollar' of additional revenue" for fuel

producers from State regulations is sufficient to confer standing (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021))).

### C. The District Court Wrongly Found that Plaintiffs Lacked Standing Solely Because Their Disabilities Are Not Currently Terminal Under the State's Interpretation of the Act

The district court did not disagree that the Act subjects people with terminal disabilities to discriminatory medical care. *See* JA 12–15. The court also did not address any element of Article III standing other than the requirement of an "actual or imminent" injury. *See id.*; *see also Lujan*, 504 U.S. at 560. The State did not challenge the redressability of Plaintiffs' injuries, and it challenged causation, if at all, in a single parenthetical in its opposition to Plaintiffs' request for preliminary relief. *See* Opp'n to Prelim. Inj., Dist. Ct. Dkt. 23 at 17. Even as to injury in fact, the court said in passing that Plaintiffs Hernandez and Cameron had not "establish[ed] a realistic danger of sustaining a direct injury," but it conducted no meaningful analysis of their risk of future harm under the Act. *See* JA 13.

Instead, the district court dismissed Plaintiffs' claims exclusively because it found that their disabilities do not currently meet the Act's definition of a terminal illness under the State's interpretation of the Act. JA 14. In the State's view, people are eligible for lethal medication only when they would die within six months even if they received all possible treatments for their condition. *See* Opp'n to Prelim. Inj., Dist. Ct. Dkt. 23 at 15. According to the State, the Act does not

treat people as terminal—no matter how soon they will actually die—if there are theoretically available treatments that could prolong their lives, even if those treatments are in fact inaccessible or refused. *See id.* at 16 n.6. Under the State's interpretation of the statute, "it is not enough that an illness or condition would be terminal if medical treatment were withdrawn." *Id.* at 15. A patient with cancer who declined surgery or chemotherapy that could prolong their life beyond six months would be ineligible for lethal medication. *See id.* The district court adopted that view, found that Hernandez and Cameron had not alleged that "any condition of theirs . . . will result in their death within six months even if they receive medical treatment," and concluded that they lacked standing on that basis alone. JA 14.

That was error. It is common in standing disputes for the parties to present different interpretations of a challenged statute, with plaintiffs claiming the statute applies to them and defendants claiming it does not. *See, e.g.*, *Cruz*, 596 U.S. at 299–300 ("These arguments have an Alice in Wonderland air about them, with the Government arguing that appellees would not violate the statute by repaying Cruz, and the appellees arguing that they would."). How courts should evaluate these disputes is clear. "For standing purposes," a court must "accept as valid the merits of [the plaintiffs'] legal claims." *Id.* at 298. "Standing is about who may access the courthouse, not about the merits of the claims to be heard once inside." *Soule*,

90 F.4th at 45.

This Court has previously rejected efforts by a State to evade litigation by advancing an interpretation of the challenged law under which the plaintiffs are not subject to it. *See Vt. Right to Life Comm.*, 221 F.3d at 383. As the Court pointed out in *Vermont Right to Life Committee*, "there is nothing that prevents the State from changing its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it asserts in this litigation." *Id.* For that reason, "the State's representation" in litigation about its understanding of the statute's scope "cannot remove [a plaintiff's] reasonable fear that it will be subjected" to the law. *Id.* The State's claim here that there is no risk the Act will apply to Hernandez and Cameron is no different than the State's claim in *Vermont Right to Life Committee* that the plaintiff could not be subject to suit under "the 'plain meaning' of" the statute. *Id.*

Indeed, the State's litigation-driven representations in this case are of even less value than they were in *Vermont Right to Life Committee* because the Act delegates the eligibility determination entirely to medical providers. In *Vermont Right to Life Committee*, the plaintiffs' only risk of harm was "enforcement of the statute by the State" itself. *Id.* But here, the Act gives providers the authority to decide whether Plaintiffs are eligible for lethal medication. *See* N.Y. Pub. Health Law § 2899-f(1)(a). The State has little role aside from data-gathering after the

fact. *See id.* § 2899-q. As the complaint alleges, providers involved in assisted suicide have stretched eligibility definitions under similar laws to include diagnoses such as "terminal anorexia" and to allow people to become terminal by stopping eating and drinking. JA 100–01, 108–10. The State's proposed narrowing construction of the statute will have no actual impact on its implementation.

It was especially inappropriate for the district court to rely on the State's interpretation of the Act because the relevant statutory language is unclear in its application to people who refuse treatment or for whom treatment is inaccessible. The Act defines a "[t]erminal illness" that makes a person eligible for assisted suicide as a medical condition that will "produce death within six months whether or not treatment is provided." N.Y. Pub. Health Law § 2899-d(17). As used in the Act, to "provide" means "to supply or make available" a treatment. *Provide*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/provide (last visited Oct. 22, 2026). Many people with life-threatening disabilities would die within six months if they refused any treatment that was "provided" to them—the Act does not specify whether such people are eligible for lethal medication. *Cf.* JA 40 (explaining that Hernandez would die without 24-hour home care). The Act also does not say whether a treatment is "provided" to a person if the treatment exists in theory but is not "suppl[ied] or ma[de] available" in practice, because of a

denial of insurance coverage or otherwise. The parties disputed below how the Act applies in each of these circumstances. *See* Opp'n to Prelim. Inj., Dist. Ct. Dkt. 23 at 16 n.6.

As the Ninth Circuit has explained, it "unavoidably tangle[s] standing with the merits" to resolve interpretive disagreements like these about the statute underlying the plaintiffs' claims while assessing the plaintiffs' standing. *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489 (9th Cir. 2024). And the district court's conclusion that Plaintiffs' interpretation would lead to "absurd results," JA 14, ignored Plaintiffs' allegations that other states' assisted suicide laws have in fact been applied to people who refuse or cannot access treatment, exactly as Plaintiffs alleged New York's law will. *See, e.g.*, JA 101 (discussing case of woman in Oregon who qualified for assisted suicide based on voluntary cessation of food and water). The court erred by accepting the State's statutory interpretation when evaluating Plaintiffs' standing.

Moreover, the district court declined to consider whether Hernandez and Cameron had standing due to the "substantial probability" that their disabilities will become terminal in the future. *Costin*, 103 F.4th at 953. The court's standing analysis was limited to its finding that no current "condition of [Plaintiffs] . . . will result in their death within six months even if they receive medical treatment." JA 14.

The limited scope of the district court's standing inquiry was inconsistent with the case law of the Supreme Court and this Court. Article III permits "a person exposed to a risk of future harm [to] pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435. A plaintiff need not always be at "present risk" from the law to seek to prevent its future enforcement against them. *Brokamp v. James*, 66 F.4th 374, 388 (2d Cir. 2023). Nor does "the standing requirement . . . 'uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about.'" *Saba Cap.*, 88 F.4th at 111 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Instead, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (holding that plaintiffs satisfied injury in fact requirement because they "alleged an actual and well-founded fear" of being subject to the challenged law).

As explained above, Plaintiffs Hernandez and Cameron alleged a substantial risk that their disabilities will become or be misdiagnosed as terminal in the future, if they are not terminal now. The district court erred by disregarding those allegations and dismissing Plaintiffs' claims based solely on their lack of a current

terminal illness under the State's interpretation of the Act. *See* JA 14.

## II. The Organizational Plaintiffs Also Have Standing

An organization "may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). The district court concluded that the organizational Plaintiffs did not have associational or direct standing to challenge the Act. JA 20, 22.

Both conclusions were incorrect. The organizational Plaintiffs established associational standing through their relationships with Hernandez, Cameron, and other disabled individuals like them. And the court's conclusion that the "Organizational Plaintiffs' core business activities as alleged are not counseling and referral services," JA 20, overlooked Plaintiffs' allegations stating precisely that. *See, e.g.*, JA 79 (alleging that Plaintiff ILCHV's "core business activity is assisting people with disabilities to live independently in the community," in part by providing "referral [and] peer counseling" services).

### A. The Organizational Plaintiffs Have Associational Standing to Sue on Behalf of Their Members

For an organization to have associational standing under Article III, it "must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's

purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The State did not challenge the organizational Plaintiffs' ability to satisfy the second or third elements of associational standing, claiming only that Plaintiffs "lack associational standing because they have not identified any members who suffer harm caused by the Act." *See* JA 30. The district court too found only that the organizational Plaintiffs had not adequately shown that any of their "members would have standing to sue in their own right" because the organizational Plaintiffs did not plausibly allege "that any of [their] members are eligible as qualified individuals under the Act." JA 22.

To meet the first element of associational standing, an organization "must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An organization is not required to identify those members by name at the pleading stage. *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 122 n.7 (2d Cir. 2025) (per curiam). But it "must allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam).

As above, the district court erred by limiting its analysis of Plaintiffs' associational standing to whether any of the organizations' members *currently* qualify for assisted suicide, without considering whether any members face a "threatened injury" as a result of the Act. *See Warth*, 422 U.S. at 511; *see also* JA 21–22. Plaintiff Cameron is herself a member of United Spinal, RCIL, and NCIL, and Plaintiff Hernandez is a member of United Spinal. JA 21. Hernandez and Cameron's "substantial risk" of harm satisfies the first element of associational standing for all three organizations. *See Susan B. Anthony List*, 573 U.S. at 158.

In addition to the standing of United Spinal, RCIL, and NCIL resulting from Hernandez and Cameron's risk of harm, other organizational Plaintiffs specifically alleged that their members face current or impending injury because of the Act. For instance, Plaintiff BCID's "participants in New York have discussed and considered accessing lethal medications and/or committing suicide by means of the Act." JA 37. The Act puts those BCID members and others "at risk of dying by offering the option of assisted suicide during a period of treatable depression and difficulty." JA 37–38.

The same is true for Plaintiffs SILO and ILCHV. *See* JA 47, 49–50. ILCHV further alleged that several of its members who already are terminal under the Act "have felt like they cannot go on living due to the lack of services they receive," and "the Act will facilitate suicide for these individuals by further

steering them away from necessary medical care." JA 80. Members of RCIL and United Spinal also are at risk of death because of the Act's facilitation of assisted suicide. *See* JA 52–53, 59–60, 81, 84.

Those risks are no more conjectural than the associational injury in *New York Public Interest Research Group v. Whitman*, 321 F.3d 316 (2d Cir. 2003), where the organizational plaintiff had standing because of its members' "uncertainty as to whether the EPA's actions expose them to excess air pollution." *Id.* at 325. As this Court explained, "the distinction between an alleged exposure to excess air pollution and uncertainty about exposure is one largely without a difference since both cause personal and economic harm." *Id.* at 326. The fears of the organizational Plaintiffs' members that they will be subjected to the Act's discriminatory medical system or steered into suicide during periods of depression are at least as concrete as the uncertainty of the organizational plaintiff's members in *NYPIRG* about whether they would be exposed to pollutants because of the challenged EPA permits.

The district court did not meaningfully address the associational standing allegations. The court determined that "Plaintiffs' legal theory of injury to individuals with disabilities also dooms Organizational Plaintiffs' claims to associational standing." JA 22. That conclusion relied on the same errors the court made in evaluating Hernandez and Cameron's individual standing, and it was

wrong for the same reasons.

Without citation or analysis, the court also concluded that Plaintiffs' allegations that the organizations' members would be "'labeled as terminally ill' do[] not equate to eligibility as a qualified individual under the Act's definitions." *Id.* But being "labeled as terminally ill" by a physician is exactly what the Act sets as its eligibility criterion; the Act makes assisted suicide available based on a doctor's "determination of whether a patient has a terminal illness or condition." N.Y. Pub. Health Law § 2899-f(1)(a). Finally, as above, the court only considered whether the organizations' members were currently "eligible as qualified individuals under the Act," without assessing their risk of future harm, and without assessing the Act's immediate impact on the quality of care they receive. JA 22; *but see, e.g.*, *Susan B. Anthony List*, 573 U.S. at 158 (reversing dismissal for failure to properly weigh the threat of future harm to plaintiffs). This Court should reverse the district court's determination that the organizational Plaintiffs lack associational standing.

### B. The Organizational Plaintiffs Suffer Direct Injuries from the Act

The organizational Plaintiffs also have standing to sue on their own behalf. An organization has direct standing if it "satisf[ies] the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024). The organization must show

"(i) an imminent 'injury in fact' to itself as an organization (rather than to its members) that is 'distinct and palpable'; (ii) that its injury is 'fairly traceable' to [the challenged action]; and (iii) that a favorable decision would redress its injuries." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)). As with the other standing theories, the State challenged only the existence of an injury in fact, and the district court dismissed Plaintiffs' claims on that basis alone. *See* JA 16–20, 30.

The injury in fact requirement is satisfied when an organization "allege[s] that the defendants' conduct 'perceptibly impaired' [its] 'core business activities.'" *Conn. Fair Hous. Ctr.*, 167 F.4th at 618 (quoting *Hippocratic Med.*, 602 U.S. at 395); *accord New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61 (2d Cir. 2020) ("An organization need only show a 'perceptible impairment' of its activities in order to establish injury in fact." (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993))). To constitute a perceptible impairment, "the challenged law or regulation must impose a cost (*e.g.*, in time, money, or danger) that adversely affects one of the activities the organization regularly conducted (prior to the challenged act) in pursuit of its organizational mission." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173–74 (2d Cir. 2021). Under *Connecticut Parents Union*, which substantially anticipated the Supreme Corut's

holding in *Hippocratic Medicine*, organizational standing turns on "the *involuntary* and *material* impacts on *core activities* by which the organizational mission has historically been carried out." *Id.* at 175.

The organizational Plaintiffs clear that bar. Plaintiffs BCID, SILO, ILCHV, and United Spinal all allege that the Act places their constituents and those who use their services at risk of dying by suicide. *See* JA 74, 78–80, 84. The threat that people who use the organizations' services will die necessarily imposes a "perceptible impairment" to those activities. *See New York*, 969 F.3d at 61. That injury is involuntary—the organizational plaintiffs did nothing to seek out a new standard of medical care that offers their members premature death. And it is material because it goes to the very heart of the organizations' missions to assist their members in overcoming entrenched medical prejudice and misconceptions that have historically steered persons with disabilities away from treatment and toward early death. *See, e.g.*, JA 59 (explaining United Spinal's mission to address medical discrimination, including the belief among some medical providers that its members' "quality of life is poor and that if they had to live like them, they would kill themselves"); JA 118 (discussing prejudicial view "that a person with a life-threatening disability is better off dead than alive").

The injury also impacts the core services of the organizations. For example, United Spinal's core activities include "operat[ing] a peer mentor support

program" to support its "[n]ewly injured members." JA 83. These individuals are "particularly vulnerable to being steered towards assisted suicide in a state of despair or depression." JA 84. "Spinal cord injuries are often unexpected and initially devastating," and newly injured individuals frequently face "depression, isolation, loss of self-confidence, and anxiety." JA 83. United Spinal's peer mentorship services support its members to ensure that they survive periods of depression, and the Act makes meaningfully more difficult this core activity by putting United Spinal's members at risk of dying during those same "period[s] of treatable depression." *See* JA 83–84.

BCID likewise offers counseling services to its members and operates a phone line that "[p]eople with disabilities call . . . frequently in despair." JA 74. It alleges that the Act will make maintaining these services more time-consuming, costly, and urgent. JA 75. ILCHV too offers "peer counseling" and "information and referral" services to its members, and it alleges that these services will be impaired because the Act encourages premature death rather than medical treatment and supports. JA 79–80. This Court's recent analysis in *Connecticut Fair Housing Center* confirms that when an organization engages in "counseling and referral services" that predate the challenged government conduct, an injury to those services is an injury in fact for standing purposes. *Conn. Fair Hous. Ctr.*, 167 F.4th at 618.

This Court has also "recognized that a cognizable injury may arise via a burden that is imposed on an organization when there is an increased demand for an organization's services." *Conn. Parents Union*, 8 F.4th at 174. In particular, organizations have standing where the challenged action has "necessitated significant and costly changes in their programmatic work and caused increased demand on their social service programs." *New York*, 969 F.3d at 60–61. The organizational Plaintiffs meet that standard.

For instance, Plaintiff SILO alleged that its core activities include educational services for people with life-threatening disabilities to discourage them from dying by suicide, and that it will "have to hire at least two additional staff members in order to account for the increased workload" as demand for those services rises due to the Act. JA 78–79. ILCHV alleged that it will need "to increase its budget and staffing" because of the greater need among its members for the organization's "assist[ance] . . . in obtaining alternatives to assisted suicide." JA 80. And the Act burdens RCIL by requiring its staff to do "additional outreach to members in order to act as a safety net for people who may consider assisted suicide." JA 82. All of these activities were "regularly conducted (prior to the challenged act) in pursuit of [Plaintiffs'] organizational mission[s]." *Conn. Parents Union*, 8 F.4th at 173–74.

The district court barely addressed these allegations. It took a blinkered

view of Plaintiffs' claims of direct injury, concluding that Plaintiffs had alleged nothing more than "[f]rustration of an organization's mission" and "expenditure of resources on educating members and the public about the Act." JA 17. It did not mention or evaluate most of Plaintiffs' allegations about the impact on their member services. And it declared that Plaintiffs' "core business activities as alleged are not counseling and referral services," JA 20, in spite of Plaintiffs' allegations that those specific services are at the core of their work, *see, e.g.*, JA 79 (alleging that "ILCHV provides a wide range of services to people with disabilities, including information and referral, peer counseling, independent living skills and training, transition services, housing services, individual and system advocacy, consumer-directed personal assistance, and veteran care").

The district court rested its dismissal of Plaintiffs' claims on a finding that their "claimed injuries mirror those alleged by the medical associations, and rejected by the Court, in" *FDA v. Alliance for Hippocratic Medicine*. JA 19. That is not right. The medical associations in *Hippocratic Medicine* claimed standing "based on their incurring costs to oppose FDA's actions," including "conduct[ing] their own studies on mifepristone," "drafting citizen petitions to FDA," and "engaging in public advocacy and public education." *Hippocratic Med.*, 602 U.S. at 394. The costs of opposing a challenged action or conducting public advocacy about it do not constitute an injury in fact because an organization "cannot spend

its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

The organizational Plaintiffs alleged that the Act will impair their core member services, not just that they will need to spend money on public advocacy to oppose it. Plaintiffs alleged that the Act puts their service recipients at risk of death, *e.g.*, JA 80, impedes the counseling they offer to help their members survive times of despair and depression, *e.g.*, JA 74–75, 79–80, 83, and increases their staffing costs to ensure that they provide a sufficient safety net for suicidal constituents, *e.g.*, JA 82.

Moreover, Plaintiffs' educational services inform their members about "options besides assisted suicide," which will become more vital and urgent because of the Act. JA 79. They do not consist only of the generalized "public advocacy and public education" about the organizations' opposition to the Act that the Supreme Court held insufficient to support standing in *Hippocratic Medicine*. *See Hippocratic Med.*, 602 U.S. at 394. This Court should reverse the district court's dismissal of the organizational Plaintiffs' claims.

## III. The Court Should Vacate the Denial of Plaintiffs' Request for Preliminary Relief

The district court denied as moot Plaintiffs' request for preliminary relief after concluding that they lacked standing. JA 23. The court did not consider the merits of the preliminary injunction. *Id.*

"It is this Court's usual practice to allow the district court to address arguments in the first instance." *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 208 (2d Cir. 2003). When a district court has denied motions based on an "erroneous conclusion" that it lacked subject matter jurisdiction, this Court has "vacate[d] those decisions of the district court and remand[ed] for further proceedings." *Hunter v. McMahon*, 75 F.4th 62, 73 (2d Cir. 2023), *abrogated in part on other grounds by T.M. v. Univ. of Md. Med. Sys. Corp.*, 608 U.S. 668 (2026). In line with that practice, this Court should vacate the denial of the preliminary injunction and remand for the district court to address Plaintiffs' request for preliminary relief on the merits.

## CONCLUSION

For the foregoing reasons, the Court should reverse the dismissal of Plaintiffs' complaint, vacate the denial of the preliminary injunction, and remand for further proceedings.

Respectfully submitted,

DATED: October 23, 2026

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Ernest Galvan*
Ernest Galvan

*Attorneys for Plaintiffs and Appellants*

## STATEMENT OF RELATED CASES

Appellants are not aware of any related cases pending before the Court.

Respectfully submitted,

DATED: October 23, 2026

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Ernest Galvan*
Ernest Galvan

*Attorneys for Plaintiffs and Appellants*

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32 (a)(7)(C), I certify that the attached brief is proportionally spaced, has a typeface of 14 points and contains 10,628 words.

Respectfully submitted,

DATED: October 23, 2026

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Ernest Galvan*
Ernest Galvan

*Attorneys for Plaintiffs and Appellants*

# ADDENDUM

## N.Y. Pub. Health Law §§ 2899-d to 2899-s

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-d

# § 2899-d. Definitions

Effective: August 5, 2026
Currentness

As used in this article:

1. "Adult" means an individual who is eighteen years of age or older.

2. "Attending physician" means the physician who has primary responsibility for the care of the patient and treatment of the patient's terminal illness or condition.

3. "Decision-making capacity" means the ability to understand and appreciate the nature and consequences of health care decisions, including the benefits and risks of and alternatives to any proposed health care, including medical aid in dying, and to reach an informed decision.

4. "Consulting physician" means a physician who is qualified by specialty or experience to make a professional diagnosis and prognosis regarding a patient's terminal illness or condition.

5. "Health care facility" means a general hospital, nursing home, or residential health care facility as defined in section twenty-eight hundred one of this chapter, or a hospice as defined in section four thousand two of this chapter.

6. "Health care provider" means an individual licensed, certified, or authorized by law to administer health care or dispense medication in the ordinary course of business or practice of a profession.

7. "Informed decision" means a decision by a patient who is suffering from a terminal illness or condition to request and obtain a prescription for medication that the patient may self-administer to end the patient's life that is based on an understanding and acknowledgment of the relevant facts and that is made voluntarily, of the patient's own volition and without coercion, after being fully informed of:

(a) the patient's medical diagnosis and prognosis;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(b) the potential risks associated with taking the medication to be prescribed;

(c) the probable result of taking the medication to be prescribed;

(d) the possibility that the patient may choose not to obtain the medication, or may obtain the medication but may decide not to self-administer it; and

(e) the feasible alternatives and appropriate treatment options, including but not limited to palliative care and hospice care.

8. "Medical aid in dying" means the medical practice of a physician prescribing medication to a qualified individual that the individual may choose to self-administer to bring about death.

9. "Medically confirmed" means the medical opinion of the attending physician that a patient has a terminal illness or condition and has made an informed decision which has been confirmed by a consulting physician who has examined the patient and the patient's relevant medical records.

10. "Medication" means medication prescribed by a physician under this article.

11. "Mental health professional" means an individual (a) licensed to practice medicine in New York state who is a diplomate of the American board of psychiatry and neurology or is eligible to be certified by that board or is certified by the American osteopathic board of neurology and psychiatry or is eligible to be certified by that board; or (b) licensed to practice psychology under title eight of the education law.

12. "Palliative care" means health care treatment, including interdisciplinary end-of-life care, and consultation with patients and family members, to prevent or relieve pain and suffering and to enhance the patient's quality of life, including hospice care under article forty of this chapter.

13. "Patient" means a resident of New York state who is eighteen years of age or older under the care of a physician.

14. "Physician" means an individual licensed to practice medicine in New York state.

15. "Qualified individual" means a patient with a terminal illness or condition, who has decision-making capacity, has made an informed decision, and has satisfied the requirements of this article in order to obtain a prescription for medication.

16. "Self-administer" means a qualified individual's affirmative, conscious, and voluntary act to ingest medication under this article. Self-administration does not include lethal injection or lethal infusion.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

17. "Terminal illness or condition" means an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided.

18. "Third-party health care payer" has its ordinary meaning and includes, but is not limited to, an insurer, organization or corporation licensed or certified under article thirty-two, forty-three or forty-seven of the insurance law, or article forty-four of the public health law; or an entity such as a pharmacy benefits manager or third-party administrator.

**Credits**

(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 1, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-d, NY PUB HEALTH § 2899-d
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-e

# § 2899-e. Request process

Effective: August 5, 2026
Currentness

1. Oral and written request. A patient wishing to request medication under this article shall make an oral request and submit a written request to the patient's attending physician. If a patient is not physically capable of making an oral request, such request can be made using an alternative method of communication familiar to the patient. Oral requests made under this subdivision must be recorded by an audio or video device and permanently stored in the patient's medical record.

2. Making a written request. A patient may make a written request for and consent to self-administer medication for the purpose of ending such patient's life in accordance with this article if the patient:

(a) has been determined by the attending physician to have a terminal illness or condition and which has been medically confirmed by a consulting physician; and

(b) based on an informed decision, requests voluntarily, of the patient's own volition and without coercion, medication to end such patient's life.

3. Written request signed and witnessed. (a) A written request for medication under this article shall be signed and dated by the patient and witnessed by at least two adults who, in the presence of the patient, attest that to the best of the persons knowledge and belief the patient has decision-making capacity, is acting voluntarily, is making the request for medication of the patient's own volition and is not being coerced to sign the request. The written request shall be in substantially the form described in section twenty-eight hundred ninety-nine-k of this article.

(b) Both witnesses shall be adults who are not:

(i) a relative of the patient by blood, marriage or adoption;

(ii) a person who at the time the request is signed would be entitled to any portion of the estate of the patient upon death under any will or by operation of law or would otherwise benefit financially from the death of the patient;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(iii) an owner, operator, employee or independent contractor of a health care facility where the patient is receiving treatment or is a resident;

(iv) a domestic partner of the patient, as defined in subdivision seven of section twenty-nine hundred ninety-four-a of this chapter;

(v) an agent under the patient's health care proxy as defined in subdivision five of section twenty-nine hundred eighty of this chapter; or

(vi) an agent acting under a power of attorney for the patient as defined in section 5-1501 of the general obligations law.

(c) The attending physician, consulting physician and the mental health professional who provides a decision-making capacity determination of the patient under this article shall not be a witness.

4. No person shall qualify for medical aid in dying under this article solely because of age or disability.

5. Requests for a medical aid-in-dying prescription must be made by the qualified individual and may not be made by any other individual, including the qualified individual's health care agent, or other agent or surrogate, or via advance healthcare directive.

**Credits**
(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 2, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-e, NY PUB HEALTH § 2899-e
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-f

# § 2899-f. Attending physician responsibilities.

Effective: August 5, 2026
Currentness

1. Upon a patient's request for a medical aid-in-dying prescription, the attending physician shall examine the patient in person and the patient's relevant medical records, provided, however, that the attending physician may waive the in-person examination requirement and conduct the examination via telehealth if the physician determines, within reasonable medical judgment, and documents in the patient's medical record that requiring an in-person visit would result in extraordinary hardship to the patient. For purposes of this subdivision, the term “extraordinary hardship” shall mean circumstances in which an in-person examination would cause the patient undue pain or suffering, or would necessitate extraordinary expense or logistical burden for medically-necessary transportation. In such cases, the examination may be conducted via telehealth once the attending physician affirms that all other requirements of this article have been fulfilled. The attending physician shall also:

(a) make a determination of whether a patient has a terminal illness or condition, has decision-making capacity, has made an informed decision and has made the request voluntarily of the patient's own volition and without coercion;

(b) inform the patient of the requirement under this article for confirmation by a consulting physician, and refer the patient to a consulting physician upon the patient's request;

(c) inform the patient of the requirement under this article for confirmation by a mental health professional, and refer the patient to a mental health professional upon the patient's request;

(d) provide information and counseling under section twenty-nine hundred ninety-seven-c of this chapter, provided, however, that if the attending physician is not willing or does not feel qualified to provide the patient with information and counseling under this paragraph, the attending physician may arrange for another physician to do so, or shall refer or transfer the patient to another physician willing to do so;

(e) ensure that the patient is making an informed decision by discussing with the patient: (i) the patient's medical diagnosis and prognosis; (ii) the potential risks associated with taking the medication to be prescribed; (iii) the probable result of taking the medication to be prescribed; (iv) the possibility that the patient may choose to obtain the medication but not take it; (v) the feasible alternatives and appropriate treatment options, including but not limited to (1) information and counseling regarding palliative and hospice care and end-of-life options appropriate to the patient, including but not limited to: the range of options appropriate to the patient; the prognosis, risks and benefits of the various options; and the patient's legal rights to comprehensive pain and symptom management at


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

the end of life; and (2) information regarding treatment options appropriate to the patient, including the prognosis, risks and benefits of the various treatment options;

(f) offer to refer the patient for other appropriate treatment options, including but not limited to palliative care and hospice care;

(g) provide health literate and culturally appropriate educational material regarding hospice and palliative care that has been prepared by the department in consultation with representatives of hospice and palliative care providers from all regions of New York state, and that is available on the department's website for access and download, provided, however, an otherwise eligible patient cannot be denied care under this article if these materials are not developed by the effective date of this article;

(h) discuss with the patient the importance of:

(i) having another person present when the patient takes the medication and the restriction that no person other than the patient may administer the medication;

(ii) not taking the medication in a public place; and

(iii) informing the patient's family of the patient's decision to request and take medication that will end the patient's life; a patient who declines or is unable to notify family shall not have such patient's request for medication denied for that reason;

(i) inform the patient that such patient may rescind the request for medication at any time and in any manner;

(j) fulfill the medical record documentation requirements of section twenty-eight hundred ninety-nine-j of this article; and

(k) ensure that all appropriate steps are carried out in accordance with this article before writing a prescription for medication.

2. Upon receiving confirmation from a consulting physician and mental health professional under section twenty-eight hundred ninety-nine-h of this article and section twenty-eight hundred ninety-nine-i of this article, respectively, the attending physician who determines that the patient has a terminal illness or condition, has decision-making capacity and has made a voluntary request for medication as provided in this article, may personally, or by referral to another physician, prescribe or order appropriate medication in accordance with the patient's request under this article, and at the patient's request, facilitate the filling of the prescription and delivery of the medication to the patient.

3. A prescription for medication shall not be filled until five days after the prescription has been written, unless the patient's attending physician has medically confirmed that the qualified individual may, within reasonable medical

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

judgment, die before the expiration of the waiting period identified herein, in which case, the prescription may be filled once the attending physician affirms that all other requirements pursuant to this article have been fulfilled. Such prescription must indicate the date and time that the prescription for medication was written and indicate the first allowable date and time when it may be filled.

4. In accordance with the direction of the prescribing or ordering physician and the consent of the patient, the patient may self-administer the medication to themselves. A health care professional or other person shall not administer the medication to the patient.

**Credits**

(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 3, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-f, NY PUB HEALTH § 2899-f

Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-g

# § 2899-g. Right to rescind request; requirement to offer opportunity to rescind

Effective: August 5, 2026
Currentness

1. A patient may at any time rescind the request for medication under this article without regard to the patient's decision-making capacity.

2. A prescription for medication may not be written without the attending physician offering the qualified individual an opportunity to rescind the request.

**Credits**
(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-g, NY PUB HEALTH § 2899-g
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-h

# § 2899-h. Consulting physician responsibilities

Effective: August 5, 2026
Currentness

Before a patient who is requesting medication may receive a prescription for medication under this article, a consulting physician must:

1. examine the patient and such patient's relevant medical records;

2. confirm, in writing, to the attending physician and the patient, whether: (a) the patient has a terminal illness or condition; (b) the patient is making an informed decision; (c) the patient has decision-making capacity; and (d) the patient is acting voluntarily, of the patient's own volition and without coercion.

**Credits**
(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 4, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-h, NY PUB HEALTH § 2899-h
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-i

# § 2899-i. Mental health professional responsibilities.

Effective: August 5, 2026
Currentness

1. Before a patient who is requesting medication may receive a prescription for medication under this article, a mental health professional must evaluate the patient and report, in writing, to the attending physician and the consulting physician, the mental health professional's independent conclusions about whether the patient has decision-making capacity to make an informed decision, provided that if, at the time of the report, the patient has not yet been referred to a consulting physician, then upon referral the attending physician shall provide the consulting physician with a copy of the mental health professional's report. If the mental health professional determines that the patient lacks decision-making capacity to make an informed decision, the patient shall not be deemed a qualified individual, and the attending physician shall not prescribe medication to the patient.

2. A determination made pursuant to this section that an adult patient lacks decision-making capacity shall not be construed as a finding that the patient lacks decision-making capacity for any other purpose.

**Credits**
(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 5, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-i, NY PUB HEALTH § 2899-i
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-j

# § 2899-j. Medical record documentation requirements

Effective: August 5, 2026
Currentness

An attending physician shall document or file the following in the patient's medical record:

1. the dates of all oral requests by the patient for medication under this article;

2. the written request by the patient for medication under this article, including the declaration of witnesses and interpreter's declaration, if applicable;

3. the attending physician's diagnosis and prognosis, determination of decision-making capacity, and determination that the patient is acting voluntarily, of the patient's own volition and without coercion, and has made an informed decision;

4. written determination of decision-making capacity under section twenty-eight hundred ninety-nine-i of this article; and

5. a note by the attending physician indicating that all requirements under this article have been met and indicating the steps taken to carry out the request, including a notation of the medication prescribed or ordered.

**Credits**
(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 6, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-j, NY PUB HEALTH § 2899-j
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-k

# § 2899-k. Form of written request and witness attestation

Effective: August 5, 2026
Currentness

1. A request for medication under this article shall be in substantially the following form:

REQUEST FOR MEDICATION TO END MY LIFE

I, ___________________________________, am an adult who has decision-making capacity, which means I understand and appreciate the nature and consequences of health care decisions, including the benefits and risks of and alternatives to any proposed health care, and to reach an informed decision and to communicate health care decisions to a physician.

I have been diagnosed with (insert diagnosis), which my attending physician has determined is a terminal illness or condition, which has been medically confirmed by a consulting physician and mental health professional and will, in the judgment of the physicians and mental health professional, produce death within six months whether or not treatment is provided.

I have been fully informed of my diagnosis and prognosis, the nature of the medication to be prescribed and potential associated risks, the expected result, and the feasible alternatives and treatment options including but not limited to palliative care and hospice care.

I request that my attending physician prescribe medication that will end my life if I choose to take it, and I authorize my attending physician to contact another physician or any pharmacist about my request.

INITIAL ONE:

( ) I have informed or intend to inform one or more members of my family of my decision.

( ) I have decided not to inform any member of my family of my decision.

( ) I have no family to inform of my decision.

I understand that I have the right to rescind this request or decline to use the medication at any time.

I understand the importance of this request, and I expect to die if I take the medication to be prescribed. I further understand that although most deaths occur within three hours, my death may take longer, and my attending physician has counseled me about this possibility.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

I make this request voluntarily, of my own volition and without being coerced, and I accept full responsibility for my actions.

Signed: ___________________________

Dated: ___________________________

DECLARATION OF WITNESSES

I declare that the person signing this “Request for Medication to End My Life”:

(a) is personally known to me or has provided proof of identity;

(b) voluntarily signed the “Request for Medication to End My Life” in my presence or acknowledged to me that the person signed it; and

(c) to the best of my knowledge and belief, has decision-making capacity and is making the “Request for Medication to End My Life” voluntarily, of the person's own volition and is not being coerced to sign the “Request for Medication to End My Life”.

I am not the attending physician or consulting physician of the person signing the “Request for Medication to End My Life” or the mental health professional who provides a decision-making capacity determination of the person signing the “Request for Medication to End My Life” at the time the “Request for Medication to End My Life” was signed.

I further declare under penalty of perjury that the statements made herein are true and correct and false statements made herein are punishable.

I further declare that I am not (i) related to the above-named patient by blood, marriage or adoption; (ii) entitled at the time the patient signed the “Request for Medication to End My Life” to any portion of the estate of the patient upon such patient's death under any will or by operation of law, or otherwise in a position to benefit financially from the patient's death; (iii) an owner, operator, employee or independent contractor of a health care facility where the patient is receiving treatment or is a resident; (iv) a domestic partner of the patient, as defined in subdivision seven of section twenty-nine hundred ninety-four-a of the public health law; (v) an agent, as defined in subdivision five of section twenty-nine hundred eighty of the public health law, under the patient's health care proxy; or (vi) an agent, as defined in section 5-1501 of the general obligations law, acting under a power of attorney for the patient.

Witness 1, Date:

(Printed name)

(Address)

(Telephone number)

Witness 2, Date:

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(Printed name)

(Address)

(Telephone number)

2. (a) The "Request for Medication to End My Life" shall be written in the same language as any conversations, consultations, or interpreted conversations or consultations between a patient and at least one of the patient's attending or consulting physicians.

(b) Notwithstanding paragraph (a) of this subdivision, the written "Request for Medication to End My Life" may be prepared in English even when the conversations or consultations or interpreted conversations or consultations were conducted in a language other than English or with auxiliary aids or hearing, speech or visual aids, if the English language form includes an attached declaration by the interpreter of the conversation or consultation, which shall be in substantially the following form:

INTERPRETER'S DECLARATION

I, (insert name of interpreter), (mark as applicable):

( ) for a patient whose conversations or consultations or interpreted conversations or consultations were conducted in a language other than English and the "Request for Medication to End My Life" is in English: I declare that I am fluent in English and (insert target language). I have the requisite language and interpreter skills to be able to interpret effectively, accurately and impartially information shared and communications between the attending or consulting physician and (name of patient).

I certify that on (insert date), at approximately (insert time), I interpreted the communications and information conveyed between the physician and (name of patient) as accurately and completely to the best of my knowledge and ability and read the "Request for Medication to End My Life" to (name of patient) in (insert target language).

(Name of patient) affirmed to me such patient's desire to sign the "Request for Medication to End My Life" voluntarily, of (name of patient)'s own volition and without coercion.

( ) for a patient with a speech, hearing or vision disability: I declare that I have the requisite language, reading and/ or interpreter skills to communicate with the patient and to be able to read and/or interpret effectively, accurately and impartially information shared and communications that occurred on (insert date) between the attending or consulting physician and (name of patient).

I certify that on (insert date), at approximately (insert time), I read and/or interpreted the communications and information conveyed between the physician and (name of patient) impartially and as accurately and completely to the best of my knowledge and ability and, where needed for effective communication, read or interpreted the "Request for Medication to End my Life" to (name of patient).

(Name of patient) affirmed to me such patient's desire to sign the "Request for Medication to End My Life" voluntarily, of (name of patient)'s own volition and without coercion.

I further declare under penalty of perjury that (i) the foregoing is true and correct; (ii) I am not (A) related to (name of patient) by blood, marriage or adoption; (B) entitled at the time (name of patient) signed the "Request

for Medication to End My Life" to any portion of the estate of (name of patient) upon such patient's death under any will or by operation of law, or otherwise in a position to benefit financially from the patient's death; (C) an owner, operator, employee or independent contractor of a health care facility where (name of patient) is receiving treatment or is a resident, except that if I am an employee or independent contractor at such health care facility, providing interpreter services is part of my job description at such health care facility or I have been trained to provide interpreter services and (name of patient) requested that I provide interpreter services to such patient for the purposes stated in this Declaration; (D) a domestic partner of the patient, as defined in subdivision seven of section twenty-nine hundred ninety-four-a of the public health law; (E) an agent, as defined in subdivision five of section twenty-nine hundred eighty of the public health law, under the patient's health care proxy; or (F) an agent, as defined in section 5-1501 of the general obligations law, acting under a power of attorney for the patient; and (iii) false statements made herein are punishable.

Executed at (insert city, county and state) on this (insert day of month) of (insert month), (insert year).

(Signature of Interpreter)

(Printed name of Interpreter)

(ID # or Agency Name)

(Address of Interpreter)

(Language Spoken by Interpreter)

(c) An interpreter whose services are provided under paragraph (b) of this subdivision shall not (i) be related to the patient who signs the "Request for Medication to End My Life" by blood, marriage or adoption; (ii) be entitled at the time the "Request for Medication to End My Life" is signed by the patient to any portion of the estate of the patient upon death under any will or by operation of law, or otherwise in a position to benefit financially from the patient's death; (iii) be an owner, operator, employee or independent contractor of a health care facility where the patient is receiving treatment or is a resident; provided that an employee or independent contractor whose job description at the health care facility includes interpreter services or who is trained to provide interpreter services and who has been requested by the patient to serve as an interpreter under this article shall not be prohibited from serving as an interpreter under this article; (iv) be a domestic partner of the patient, as defined in subdivision seven of section twenty-nine hundred ninety-four-a of this chapter; (v) be an agent, as defined in subdivision five of section twenty-nine hundred eighty of this chapter, under the patient's health care proxy; or (vi) be an agent, as defined in section 5-1501 of the general obligations law, acting under a power of attorney for the patient.

**Credits**

(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 7, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-k, NY PUB HEALTH § 2899-k

Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-l

# § 2899-l. Protection and immunities

Effective: August 5, 2026
Currentness

1. A physician, pharmacist, other health care provider or other person shall not be subject to civil, administrative, or criminal liability or penalty or professional disciplinary action by any government entity for taking any reasonable good-faith action or refusing to act under this article, including, but not limited to: (a) engaging in discussions with a patient relating to the risks and benefits of end-of-life options in the circumstances described in this article, (b) providing a patient, upon request, with a referral to another health care provider, (c) being present when a qualified individual self-administers medication, (d) refraining from acting to prevent the qualified individual from self-administering such medication, or (e) refraining from acting to resuscitate the qualified individual after the qualified individual self-administers such medication.

2. A health care provider or other person shall not be subject to employment, credentialing, or contractual liability or penalty for any reasonable good-faith action or refusing to act under this article, including, but not limited to:

(a) engaging in discussions with a patient relating to the risks and benefits of end-of-life options in the circumstances described in this article;

(b) providing a patient, upon request, with a referral to another health care provider;

(c) being present when a qualified individual self-administers medication;

(d) refraining from acting to prevent the qualified individual from self-administering such medication; or

(e) refraining from acting to resuscitate the qualified individual after the qualified individual self-administers such medication. However, this subdivision does not bar a health care facility from acting under paragraph (c) of subdivision two of section twenty-eight hundred ninety-nine-m of this article.

3. Nothing in this section shall limit civil, administrative, or criminal liability or penalty or any professional disciplinary action, or employment, credentialing, or contractual liability or penalty for negligence, recklessness or intentional misconduct.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Credits**

(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-l, NY PUB HEALTH § 2899-l

Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-m

# § 2899-m. Permissible refusals and prohibitions

Effective: August 5, 2026
Currentness

1. (a) A physician, nurse, pharmacist, other health care provider or other person shall not be under any duty, by law or contract, to participate in the provision of medication to a patient under this article.

(b) If a health care provider is unable or unwilling to participate in the provision of medication to a patient under this article and the patient transfers care to a new health care provider, the prior health care provider shall transfer or arrange for the transfer, upon request, of a copy of the patient's relevant medical records to the new health care provider.

2. (a) A private health care facility may prohibit the prescribing, dispensing, ordering or self-administering of medication under this article while the patient is being treated in the health care facility or in an affiliated facility that is majority-owned, operated, or controlled by the same corporate entity as the health care facility, or while the patient is residing in the health care facility if:

(i) the prescribing, dispensing, ordering or self-administering is contrary to a formally adopted policy of the health care facility that is expressly based on sincerely held religious beliefs or moral convictions central to the health care facility's operating principles; and

(ii) the health care facility has informed the patient of such policy prior to admission or as soon as reasonably possible.

(b) Where a health care facility has adopted a prohibition under this subdivision, if a patient who wishes to use medication under this article requests, the patient shall be transferred promptly to another health care facility that is reasonably accessible under the circumstances and willing to permit the prescribing, dispensing, ordering and self-administering of medication under this article with respect to the patient.

(b-1) A health care facility or an affiliated facility that is majority-owned, operated, or controlled by the same corporate entity as the health care facility that has adopted a prohibition under this subdivision may restrict any employee from participating in the provision of medication under this article.

(c) Where a health care facility has adopted a prohibition under this subdivision, any health care provider or employee or independent contractor of the health care facility or any facility that is majority-owned, operated, or controlled by the same corporate entity as the health care facility who violates the prohibition may be subject to sanctions otherwise available to the health care facility, provided the health care facility has previously notified the health care provider, employee or independent contractor of the prohibition in writing.

3. Nothing in this section shall be construed to restrict a patient at home from accessing care under this article.

**Credits**

(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 8, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-m, NY PUB HEALTH § 2899-m
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-n

# § 2899-n. Relation to other laws and contracts

Effective: August 5, 2026
Currentness

1. (a) A patient who requests medication under this article shall not, because of that request, be considered to be a person who is suicidal, and self-administering medication under this article shall not be deemed to be suicide, for any purpose.

(b) Action taken in accordance with this article shall not be construed for any purpose to constitute suicide, assisted suicide, attempted suicide, promoting a suicide attempt, euthanasia, mercy killing, or homicide under the law, including as an accomplice or accessory or otherwise.

2. (a) No provision in a contract, other agreement or testamentary instrument, whether written or oral, to the extent the provision would affect whether a person may make or rescind a request for medication or take any other action under this article, shall be valid.

(b) No obligation owing under any contract, other agreement or testamentary instrument shall be conditioned or affected by the making or rescinding of a request by a person for medication or taking any other action under this article.

3. (a) A person and such person's beneficiaries shall not be denied benefits under a life insurance policy for actions taken in accordance with this article.

(b) The sale, procurement or issuance of a life insurance or annuity policy or third-party health care payer policy or coverage, or the rate charged for a policy or coverage, shall not be conditioned upon or affected by a patient making or rescinding a request for medication under this article.

(c) This article shall not limit the effect of a life insurance policy provision concerning incontestability pursuant to article thirty-two of the insurance law or any rights or obligations concerning a material misrepresentation in accordance with article thirty-one of the insurance law.

(d) No third-party health care payer may deny coverage for any service or item that would otherwise be covered by the policy because the patient has or has not chosen to request or use medication under this article.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

4. An insurer or third-party health care payer shall not provide any information in communications made to a patient about the availability of medication under this article absent a request by the patient or by such patient's attending physician upon the request of such patient. Any communication from an insurer or third-party health care payer indicating a denial of coverage for treatment shall not also include any information as to the availability of medication prescribed under this article. This subdivision does not bar the inclusion of information as to the coverage of medication and professional services under this article in information generally stating what is covered by a third-party health care payer or provided in response to a request by the patient or by such patient's attending physician upon the request of the patient.

5. The sale, procurement, or issue of any professional malpractice insurance policy or the rate charged for the policy shall not be conditioned upon or affected by whether the insured does or does not take or participate in any action under this article.

**Credits**

(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026. Amended L.2026, c. 1, § 9, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-n, NY PUB HEALTH § 2899-n

Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-o

# § 2899-o. Safe disposal of unused medications

Effective: August 5, 2026
Currentness

A person who has custody or control of any unused medication prescribed under this article after the death of the qualified individual shall personally deliver the unused medication for disposal to the nearest qualified facility that properly disposes of controlled substances or shall dispose of it by lawful means in accordance with regulations made by the commissioner, regulations made by or guidelines of the commissioner of education, or guidelines of a federal drug enforcement administration approved take-back program. A qualified facility that properly disposes of controlled substances shall accept and dispose of any medication delivered to it as provided hereunder regardless of whether such medication is a controlled substance. The commissioner may make regulations as may be appropriate for the safe disposal of unused medications prescribed, dispensed or ordered under this article as provided in this section.

**Credits**
(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-o, NY PUB HEALTH § 2899-o
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-p

# § 2899-p. Death certificate

Effective: August 5, 2026
Currentness

1. If otherwise authorized by law, the attending physician may sign the qualified individual's death certificate.

2. The cause of death listed on a qualified individual's death certificate who dies after self-administering medication under this article will be the underlying terminal illness or condition.

**Credits**

(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-p, NY PUB HEALTH § 2899-p
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-q

# § 2899-q. Reporting

Effective: August 5, 2026
Currentness

1. The commissioner shall annually review a sample of the records maintained under sections twenty-eight hundred ninety-nine-j and twenty-eight hundred ninety-nine-p of this article. The commissioner shall adopt regulations establishing reporting requirements for physicians taking action under this article to determine utilization and compliance with this article. The information collected under this subdivision shall not constitute a public record available for public inspection and shall be confidential and collected and maintained in a manner that protects the privacy of the patient, the patient's family, and any health care provider acting in connection with such patient under this article, except that such information may be disclosed to a governmental agency as authorized or required by law relating to professional discipline, protection of public health or law enforcement.

2. The commissioner shall prepare a report annually containing relevant data regarding utilization and compliance with this article and shall send such report to the legislature, and post such report on the department's website.

**Credits**
(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-q, NY PUB HEALTH § 2899-q
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-r

# § 2899-r. Penalties

Effective: August 5, 2026
Currentness

1. Nothing in this article shall be construed to limit professional discipline or civil liability resulting from conduct in violation of this article, negligent conduct, or intentional misconduct by any person.

2. Conduct in violation of this article shall be subject to applicable criminal liability under state law, including, where appropriate and without limitation, offenses constituting homicide, forgery, coercion, and related offenses, or federal law.

**Credits**
(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-r, NY PUB HEALTH § 2899-r
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Public Health Law (Refs & Annos)
Chapter 45. Of the Consolidated Laws (Refs & Annos)
Article 28-F. Medical Aid in Dying

McKinney's Public Health Law § 2899-s

# § 2899-s. Severability

Effective: August 5, 2026
Currentness

If any provision of this article or any application of any provision of this article, is held to be invalid, or to violate or be inconsistent with any federal law or regulation, that shall not affect the validity or effectiveness of any other provision of this article, or of any other application of any provision of this article, which can be given effect without that provision or application; and to that end, the provisions and applications of this article are severable.

**Credits**

(Added L.2025, c. 714, § 2, eff. Aug. 5, 2026.)

McKinney's Public Health Law § 2899-s, NY PUB HEALTH § 2899-s
Current through L.2026, chapters 1 to 312. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.